**THE SMITH LAW FIRM, PLLC**
R. ALLEN SMITH – Miss. Bar No. 99984 (pro hac vice)
Email: asmith@smith-law.org
MADISON KEYES – Miss. Bar No. 105530 (pro hac vice)
Email: mkeyes@smith-law.org
300 Concourse Blvd., Suite 104
Ridgeland, MS  39157
Telephone:  601-952-1422
Fax: 601-952-1426

**SHENAQ, PC**
AMIR SHENAQ – Georgia No. 505281(pro hac vice)
3500 Lenox Road Ste. 1500
Atlanta, GA 30326
Telephone: (888) 909-9993
Telecopier: (713) 583-3538
E-mail: amir@shenaqpc.com

**LAW OFFICES OF EZEQUIEL REYNA, JR., P.C.**
EZEQUIEL REYNA, JR.  – TX Bar No. 16794798 (pro hac vice)
702 W. Expressway 83, Suite 100
Weslaco, Texas 78596
Telephone:(956) 968-9556
Fax: (956) 969-0492
Email: zeke@zreynalaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CECIL CONRAD, INDIVIDUALLY AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF ORADELL D. CONRAD, DECEASED, <br><br> Plaintiff, <br> v. <br><br> SYNGENTA AG; SYNGENTA CROP PROTECTION, LLC; and DOES 1 through 60 inclusive, <br><br> Defendants. | This Document Relates to Civil Action No.: _____ <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Cecil Conrad, (hereinafter referred to as "Plaintiff") individually, and on behalf of all wrongful death beneficiaries of Oradell D. Conrad, deceased, (hereinafter referred to as "Decedent") by and through counsel Allen Smith of THE SMITH LAW FIRM, PLLC, alleges upon information and belief and complains of Defendants Syngenta AG ("SAG") and Syngenta Crop Protection, LLC ("SCPLLC") (together with their predecessors-in-interest, referred to collectively as the "Syngenta Defendants"); and Does One through Sixty, and states:

## SUMMARY OF THE CASE

1.     Paraquat is a synthetic chemical compound [1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Virginia.

2.     Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold paraquat for use in Virginia, acted in concert with others who manufactured, distributed, and sold paraquat for use in Virginia, sold and used paraquat in Virginia, or owned property in Virginia where paraquat was used.

3.     Plaintiff brings this suit against Defendants to recover damages for personal injuries resulting from Plaintiff's exposure to paraquat over many years in Virginia.

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

# I. PARTIES

**A.**    <u>**Plaintiff**</u>

4.    The Decedent suffered from Parkinson's Disease caused by his exposure to the herbicide Paraquat and later passed away on or about December 04, 2022.

5.    The Decedent was a Colorado resident at the time of his death.

6.    Plaintiff is the son of the Decedent, Oradell D. Conrad, and is an adult resident of New York.

**B.**    <u>**Defendants**</u>

7.    Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware LLC. SCPLLC is a wholly owned subsidiary of Defendant SAG; therefore, SCPLLC is a citizen or subject of the nation of Switzerland.

8.    Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland. SAG is a citizen or subject of the nation of Switzerland.

# II. JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the plaintiff and the defendants and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.    Venue is proper in this district under 28 U.S.C. §1391 because Defendants' conduct business in this District, are subject to jurisdiction in this district, and have sold, marketed, and or distributed paraquat within this District at all times relevant to this suit, because a substantial part of the acts or occurrences giving rise to this suit occurred within this District.

11.    Notwithstanding the previous paragraph, this Complaint is filed in the Southern District of Illinois pursuant to the Court's Order of June 10, 2021, allowing direct filing of actions. However, it is not intended as a waiver of any rights relating to *Lexecon,* venue, or choice of law.

To the contrary, Plaintiffs expressly reserve any *Lexecon* rights or rights relating to venue or choice of law.

### III. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.    **Defendants and their predecessors.**

1. *Syngenta Crop Protection LLC and Syngenta AG*

10.    In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

11.    In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively "ICI Americas").

12.    In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

13.    In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

14.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

15.    Before ICI's demerger and creation of the Zeneca Group, ICI had a Central

Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

16.     As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

17.     After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

18.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

19.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

20.     As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

21.     In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca

5

Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

22.    In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

23.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

24.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

25.    Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

26.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

27.    In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the

State of Delaware with its principal place of business in Greensboro, North Carolina.

28.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Novartis AG.

29.     SAG is a successor in interest to the crop-protection business of its corporate predecessor AstraZeneca PLC.

30.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Group PLC.

31.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

32.     SAG is a successor in interest to the crop-protection business of its corporate predecessor ICI Bioscience Ltd.

33.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Plant Protection Ltd.

34.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor SCPI.

35.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor NCPI.

36.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Ciba-Geigy Corporation.

37.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Inc.

38.     SCPLLC is a successor by merger or continuation of business to its corporate

predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North

America Inc., ICI America Inc., and ICI United States Inc.

39.     SCPLLC does substantial business in the State of Virginia, including the

following:

> a. markets, advertises, distributes, sells, and delivers paraquat and other
> pesticides to distributors, dealers, applicators, and farmers in the State of
> Virginia;
>
> b. secures and maintains the registration of paraquat and other pesticides with
> the EPA and the State of Virginia to enable itself and others to manufacture,
> distribute, sell, and use these products in the State of Virginia; and
>
> c. performs, hires others to perform, and funds or otherwise sponsors or
> otherwise funds the testing of pesticides in the State of Virginia.

40.     SAG is a foreign corporation organized and existing under the laws of Switzerland,

with its principal place of business in Basel, Switzerland.

41.     SAG is a holding company that owns stock or other ownership interests, either

directly or indirectly, in other Syngenta Group companies, including SCPLLC.

42.     SAG is a management holding company.

43.     Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal

place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

44.     SCPAG employs the global operational managers of production, distribution, and

marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

45.     The Syngenta Group's CP and Seeds Divisions are the business units through which

SAG manages its CP and Seeds product lines.

46.     The Syngenta Group's CP and Seeds Divisions are not and have never been

corporations or other legal entities.

47.    SCP AG directly and wholly owns Syngenta International AG ("SIAG").

48.    SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

49.    SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

50.    SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

51.    Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

52.    SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

a.    SAG directly and wholly owns Syngenta Participations AG;

b.    Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

c.    Seeds JV C.V. directly and wholly owns Syngenta Corporation;

d.    Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;

e.    Syngenta Seeds, LLC directly and wholly owns SCPLLC.

53.    Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

54.    SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

55.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

56.    Although the formal legal structure of the Syngenta Group is designed to suggest

otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

57.    The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

58.    SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

59.    SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SCPLLC.

60.    The SEC consists of the CEO and various global Heads, which currently are:

    a. The Chief Executive Officer;

    b. Group General Counsel;

    c. The President of Global Crop Protection;

    d. The Chief Financial Officer;

    e. The President of Global Seeds; and

    f. The Head of Human Resources;

61.    SIAG employs all of the members of the Executive Committee.

62.    Global Syngenta Group corporate policies require SAG subsidiaries, including SCPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

63.     SAG's board of directors meets five to six times a year.

64.     In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

65.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

66.     Since SCPI became SCPLLC, decisions that are normally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

67.     Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

68.     Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

69.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

70.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

71.     The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's

worldwide CP business.

72.    Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

73.    The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

74.    The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

75.    Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

76.    Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

77.    The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

78.     SCPLLC performs its functions according to its role in the CP Division structure:

a.      CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b.      New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c.      These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.      Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.      Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.      If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.      Decisions to sell the product must be approved by the SEC; and

h.      The products that are sold all bear the same Syngenta trademark and logo.

79.     SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

80.     These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

81.     For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including

SCPLLC, if their value exceeds an amount specified in the "reserved powers."

82.    Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

83.    Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

84.    Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

85.    SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

    a.  Product development;

    b.  Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

    c.  Production;

    d.  Marketing;

    e.  Sales;

    f.  Human resources;

    g.  Communications and public affairs;

    h.  Corporate structure and ownership;

    i.  Asset sales and acquisitions;

    j.  Key appointments to boards, committees and management positions;

    k.  Compensation packages;

l.  Training for high-level positions; and

m.  Finance (including day-to-day cash management) and tax.

86.    Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

87.    Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

88.    The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

89.    The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

90.    Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

91.    The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

92.     Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

93.     SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

94.     SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Virginia, in the ways previously alleged as to SCPLLC.

**B.    Paraquat manufacture, distribution, and sale**

95.     ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.

96.     The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

97.     ICI produced the first commercial paraquat formulation and registered it in England in 1962.

98.     Paraquat was marketed in 1962 under the brand name Gramoxone.

99.     Paraquat first became commercially available for use in the United States in 1964.

100.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Virginia, where they registered such products with the State of Virginia to enable them to be lawfully distributed, sold, and used in Virginia, and marketed, advertised, and promoted them to Virginia distributors, dealers, applicators, and farmers.

101.    SAC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United

States from about 1964 through the present.

102.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Virginia, where they registered such products with the State of Virginia to enable them to be lawfully distributed, sold, and used in Virginia, and marketed, advertised, and promoted them to Virginia distributors, dealers, applicators, and farmers.

103.    SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

104.    The Decedent was exposed to Paraquat from approximately 1995 until approximately 1999: (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

105.    As a direct result of the Decedent's exposure to paraquat, Decedent began suffering symptoms associated with Parkinson's Disease and was diagnosed with PD in or about 2000 and later passed away on or about December 04, 2022.

106.    No doctor or any other person ever told Plaintiff or Decedent that the Decedent's Parkinson's disease or subsequent death was or could have been caused by exposure to paraquat.

107.    Until recently, neither Plaintiff nor Decedent had never read or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's Disease with paraquat.

108.    Until recently, neither Plaintiff nor Decedent had ever read or heard of any lawsuit alleging that paraquat causes Parkinson's disease.

109.    At no time when Decedent was present as paraquat was being sprayed was he aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's Disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

110.    On information and belief, the paraquat to which Decedent was exposed was sold and used in Virginia, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Virginia.

111.    On information and belief, Decedent was exposed to paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of the Decedent's exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

112.    On information and belief, Decedent was exposed to paraquat that was sold and used in Virginia, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Virginia.

113.    On information and belief, Decedent was exposed to paraquat that was sold and used in Virginia, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Virginia.

### C.    **Paraquat use**

114.    Since 1964, paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

115.    At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable. The use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants.

116.    At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

117.    At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

118.    At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn

pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

### D.   Paraquat exposure

119.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

120.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

121.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

122.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

123.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

124. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

125. At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

126. At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

127. At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

128. At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.    Parkinson's disease**

129. PD is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

130. Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

*1. Symptoms and treatment*

131. The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

132.    PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

133.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

134.    There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### *2. Pathophysiology*

135.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

136.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

137.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

138.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

139.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary

pathophysiological hallmarks of PD.

140.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

141.    Scientists who study PD generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**F.    Paraquat's toxicity**

142.    Paraquat is highly toxic to both plants and animals.

143.    Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

144.    Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

145.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

146.    The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

147.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living

cells.

148.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.

149.    Paraquat's redox properties have been known since at least the 1930s.

150.    That paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

151.    The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

### G.    Paraquat and Parkinson's disease

152.    The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons—paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

153.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features of PD.

154.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

155.    In animal models of PD, hundreds of studies involving various routes of exposure

have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

156.    Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

157.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with occupational exposure to paraquat compared to populations without such exposure.

158.    Defendants had knowledge of these studies and the relationship between paraquat exposure and PD but actively and fraudulently concealed this information from Plaintiff and others.

## H.    Paraquat regulation

159.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 *et seq*., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

160.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

161.    As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides.

162.    FIFRA does not require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

163.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studies

and data submitted by the registrant, that:

> a. its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

> b. its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

> it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

> c. when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

164.    FIFRA defines "unreasonable adverse effects on the environment'' as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

165.    Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

166.    However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

167.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).

168.    A pesticide is misbranded under FIFRA if, among other things:

> a. its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that  is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

> b. the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c. the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

169.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims and seek relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

## IV. FRAUDULENT CONCEALMENT AND TOLLING

170.    Neither Plaintiff nor Decedent discovered this earlier because neither had any reason to suspect that Decedent's working with Paraquat could cause Decedent to suffer Parkinson's disease.

171.    Defendants took active steps to conceal this harmful side effect of Paraquat.

172.    Indeed, in response to growing concerns regarding the safety of Paraquat, Syngenta published a website at www.paraquat.com for the purpose of convincing the public that Paraquat is safe.

173.    Syngenta's statements proclaiming the safety of Paraquat and disregarding its dangers were designed to mislead the agricultural community and the public at large – including Decedent.

174.    Defendants knew or should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

175.    However, despite this knowledge, Defendants continued to promote its product as safe.

176.    Defendants did not make this knowledge known to Plaintiff, Decedent, or the general public. Indeed, Defendants failed to adequately warn and instruct Plaintiff or Decedent of a possible association between Paraquat use and Parkinson's disease.

177.    Even today, Syngenta disavows any connection between Paraquat and Parkinson's disease.

178.    Defendants' acts and omissions were a legal, proximate, and substantial factor in causing Decedent to suffer severe and permanent physical injuries, pain, mental anguish, and disability, as well as economic loss, and death.

179.    All applicable statutes of limitations have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

## V. ALLEGATIONS COMMON TO SPECIFIC CAUSES OF ACTION

### A. Strict Product Liability – Design Defect

180.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. paraquat business.

181.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Virginia.

182.    Decedent was exposed to paraquat sold and used in Virginia that Defendants,

Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Virginia.

183.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

> a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and
>
> b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

184.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

185.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**B.** **Strict Product Liability – Failure to Warn**

186.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Virginia.

187.    Decedent was exposed to paraquat sold and used in Virginia that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert  designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Virginia.

188.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Decedent was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

> a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

> b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

189.    The paraquat that Defendants, Defendants' corporate predecessors, and others with

whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

> a. it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

> b. it was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

190.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

191.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

192.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**C. Negligence**

31

193.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Virginia.

194.    Decedent was exposed to paraquat sold and used in Virginia that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert  designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Virginia.

195.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Decedent was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

196.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Decedent.

197.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which Decedent was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.      when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

198.      In breach of the aforementioned duty to Decedent, Defendants, Defendants'

corporate predecessors, and others with whom they acted in concert negligently:

a.      failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.      designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.      failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.      failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.      failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.      failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons

who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.    failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.    failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

### D. Breach of Express Warranties and Implied Warranty of Merchantability

199.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides and themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

200.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in the state of Decedent's residence.

201.    Decedent was exposed to paraquat sold and used in the state of Decedent's residence that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in the state of Decedent's residence.

202.    At the time of each sale of paraquat to which Decedent was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert made express

warranties and/or impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

203.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Decedent was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

## COUNT 1
## DEFENDANTS SCPLLC AND SAG
## STRICT PRODUCT LIABILITY – DESIGN DEFECT
## PERSONAL INJURIES

204.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

205.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent developed PD; suffered severe and permanent physical pain, mental anguish, disability, had a loss of income, reasonable expenses for necessary medical treatment, later passed away.

## COUNT 2
## DEFENDANTS SCPLLC AND SAG
## STRICT PRODUCT LIABILITY – FAILURE TO WARN
## PERSONAL INJURIES

206.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

207.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent developed PD; suffered severe and permanent physical pain, mental anguish, disability, had a loss of income, reasonable expenses for necessary medical treatment, later passed away.

**COUNT 3**
**DEFENDANTS SCPLLC AND SAG**
**NEGLIGENCE**
**PERSONAL INJURIES**

208.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

209.    As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent developed PD; suffered severe and permanent physical pain, mental anguish, disability, had a loss of income, reasonable expenses for necessary medical treatment, later passed away.

**COUNT 4**
**DEFENDANTS SCPLLC AND SAG**
**BREACH OF EXPRESS WARRANTIES AND IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**PERSONAL INJURIES**

210.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

211.    As a direct and proximate result of the breaches of express warranty and the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent developed PD; suffered severe and permanent physical pain, mental anguish, disability, had a loss of income, reasonable expenses for necessary medical treatment, later passed away.

**PRAYER FOR RELIEF**

212.    As a result of the foregoing Plaintiff requests this Court to enter judgment in their

favor and against the Defendants, jointly and severally, for compensatory damages, costs, pre-
and post-judgment interest, and attorneys' fees, severally for punitive damages, and for such
further relief to which he may show herself to be entitled.

## **DEMAND FOR JURY TRIAL**

213.    Pursuant to FED. R. CIV. P. 38(b), Plaintiff respectfully demands a jury trial on all
issues triable by jury.

Dated: November 12, 2024                                  Respectfully Submitted,


                                                          /s/ Madison Keyes
                                            **THE SMITH LAW FIRM, PLLC**
                                            R. ALLEN SMITH – Miss. Bar No. 99984
                                            Email: asmith@smith-law.org
                                            MADISON KEYES – Miss. Bar No. 105530
                                            Email: mkeyes@smith-law.org
                                            300 Concourse Blvd., Suite 104
                                            Ridgeland, MS  39157
                                            Telephone:  601-952-1422
                                            Fax: 601-952-1426

                                            **SHENAQ, PC**
                                            AMIR SHENAQ – Georgia No. 505281
                                            3500 Lenox Road Ste. 1500
                                            Atlanta, GA 30326
                                            Telephone: (888) 909-9993
                                            Telecopier: (713) 583-3538
                                            E-mail: amir@shenaqpc.com

                                            **LAW OFFICES OF EZEQUIEL REYNA,
                                            JR., P.C.**
                                            EZEQUIEL REYNA, JR.  – TX Bar
                                            No.  16794798
                                            702 W. Expressway 83, Suite 100
                                            Weslaco, Texas 78596
                                            Telephone:(956) 968-9556
                                            Fax: (956) 969-0492
                                            Email: zeke@zreynalaw.com

                                            *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2024, I electronically filed this Complaint with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to counsel of record.

Respectfully Submitted,


_____/s/ Madison Keyes_____

**THE SMITH LAW FIRM, PLLC**
R. ALLEN SMITH – Miss. Bar No. 99984
Email: asmith@smith-law.org
MADISON KEYES – Miss. Bar No. 105530
Email: mkeyes@smith-law.org
300 Concourse Blvd., Suite 104
Ridgeland, MS  39157
Telephone:  601-952-1422
Fax: 601-952-1426

**SHENAQ, PC**
AMIR SHENAQ – Georgia No. 505281
3500 Lenox Road Ste. 1500
Atlanta, GA 30326
Telephone: (888) 909-9993
Telecopier: (713) 583-3538
E-mail: amir@shenaqpc.com

**LAW OFFICES OF EZEQUIEL REYNA, JR., P.C.**
EZEQUIEL REYNA, JR.  – TX Bar
No.  16794798
702 W. Expressway 83, Suite 100
Weslaco, Texas 78596
Telephone:(956) 968-9556
Fax: (956) 969-0492
Email: zeke@zreynalaw.com

*Attorneys for Plaintiff*